JOHN WILMOT and others, Appellants, *v.* THOMAS RICH-
ARDSON and others, Respondents.

Plaintiffs sold to one Patterson a quantity of flour for cash, delivering the
same on board vessels to be shipped through defendants, to their house in
Liverpool, for sale.   Patterson failed to pay for the flour in full, and an action
was commenced against him by the plaintiffs for the balance of the purchase-
money.   They subsequently commenced this suit against these defendants to
recover from *them* this same unpaid balance.   *Held*, that the sale and delivery
to Patterson were ratified by the suit against him, and left the plaintiffs with-
out cause of action against defendants; also, that the receipt by plaintiffs of
the defendants' acceptance of Patterson's order on them, and of moneys on
said order, was further evidence of ratification of the sale to Patterson.

THIS is an action to recover the sum of seven thousand
six hundred forty-eight dollars and ninety-six cents, with
interest from the sixth day of December, 1854, being the
balance of the purchase-money of one thousand eight
hundred ninety-seven barrels of flour, sold by the plaintiffs
to one Walter Patterson, and by Patterson transferred to
the defendants, under the circumstances hereafter stated.

During the year 1854, the plaintiffs were copartners,
doing business in the city of New York, under the firm
name of John Wilmot & Co., and during the same period
the defendants were copartners, doing business in said
city, under the firm name of Thomas Richardson & Co.

The defendants were commission merchants, having a
house in Liverpool to which they were accustomed to take
consignments.   During the same period, Walter Patterson
was a dealer in flour and other merchandise, in the city of
New York.

In the latter part of April, 1854, Patterson applied to
the defendants, stating that he was making large shipments
of flour to London, and was desirous of shipping also to
Liverpool, and proposed that the latter shipments should
be consigned to Richardson, Spence & Co., the defendants'
Liverpool house, and that the defendants should make the

necessary advances thereon. The defendants assented to the proposition, and agreed to advance seven ($7) dollars per barrel on all that should be so consigned, provided the quality should be satisfactory.

Under this arrangement, and between the twenty-eighth of April and the twelfth of May, 1854, Patterson shipped to Liverpool eight thousand one hundred sixty-four barrels of flour, all consigned to said Richardson, Spence & Co., and the defendants made advances on account thereof, from time to time, between the same dates, amounting in all to the sum of fifty-seven thousand six hundred and forty-eight dollars. ($57,648.)

While these shipments were going forward, Patterson purchased of the plaintiffs the one thousand eight hundred and ninety-seven barrels of flour now in controversy, being part of the eight thousand one hundred and sixty-four barrels before referred to. The purchase was made through a broker by the name of McKean, who delivered to the parties bought and sold notes, bearing date the fifth of May, the day on which the purchase was made.

· Between the fifth and the eleventh of May, it was all delivered on board ship by the plaintiffs, pursuant to Patterson's orders (*i. e.* one thousand six hundred and ninety-seven barrels on board the *Washington*, and the remaining two hundred barrels on board the *Dacotah*), and the ships' receipts obtained therefor.

On or before the eleventh, the plaintiffs sent an invoice of the flour to Patterson, and also wrote him a letter on the eleventh, stating that the flour was all on board, and the receipts ready, and requesting the payment of the money, the terms of the sale having been cash on delivery.

On the twelfth of May, Patterson sent to the plaintiffs two or three times for the ships' receipts, which the plaintiffs declined to deliver until the money was paid.

On the same day Mr. Kean, the broker, went to the plaintiffs, and stated that the flour was consigned to

Richardson, and the money was to come from him, that the money could not be obtained without the receipts, and that it would all be right. The plaintiffs said they would not deliver the receipts without the money; but they would trust him with them to go to Richardson, and, if he did not get the money, he was to bring them back.

On the same day, after the receipts were delivered to McKean, Patterson sent two checks to the plaintiffs for the amount of the bill, one being for five thousand one hundred fifteen dollars and twelve cents, and certified, the other for ten thousand dollars, not certified, and dated ahead; the plaintiffs refused to receive these checks, and sent them back by the person who brought them.

On the thirteenth, being Saturday, Patterson went to Philadelphia, leaving a check for the plaintiffs for five thousand ($5,000) dollars, which the plaintiffs received on the same day and kept.

On the ninth of May, Patterson applied for and obtained from the defendants, the whole of his advance on the one thousand eight hundred and ninety-seven barrels of flour in question, amounting to the sum of thirteen thousand two hundred and seventy-nine dollars ($13,279), the defendants knowing at that time that the flour was coming from the plaintiffs.

When the advance was made, the defendants received neither the ship's receipts nor bill of lading, for the one thousand six hundred and ninety-seven barrels shipped on board the *Washington.*

On the twelfth, the defendants received from Patterson the bill of lading for the one thousand six hundred and ninety-seven barrels, and at the same time made him an advance of six thousand six hundred and fifty-one dollars and ten cents ($6,651.10).

On the thirteenth or fourteenth of May the *Washington* sailed. The *Dacotah* sailed about the same time.

On Monday night, the fifteenth, Patterson returned from

Philadelphia. On Tuesday he saw the defendants, and endeavored to make some arrangement with them for the payment of the plaintiffs' claim. He was also at the plaintiffs' office on the same day; and the plaintiff, Wilmot, was at his office.

Patterson offered to give him an order on the defendants for the surplus proceeds of the eight thousand one hundred and sixty-four barrels of flour consigned to the latter, after deducting their commissions and advances, which order Wilmot refused to receive.

Patterson then offered to give Wilmot an order on his London consignees, or an acceptance from the defendants in the plaintiff's favor, on the strength of his consignments to Liverpool and London.

Wilmot also called at the defendants' office on the same day, to ascertain the facts in regard to the defendants' advances to Patterson. He saw their books and obtained a statement of their advances.

On the following day, Wednesday, at about 10 A. M., Wilmot and Patterson called upon the defendants together, by appointment, to see if some arrangement could be made; but the defendant, Richardson, being busy writing letters for the steamer, told them to call again at 12 o'clock, or after. Patterson returned to the defendants' office in a few minutes, alone, and then left in the steamer for Liverpool, at 12 M. Wilmot called at the defendants' office again at 12, according to appointment.

At one of the interviews on Wednesday, Patterson left with the defendants a draft on them for ten thousand ($10,000) dollars, in the plaintiffs' favor, and also the order for surplus proceeds, before referred to.

On the same day, or soon after, at the request of Patterson's clerk, the defendants wrote to the plaintiffs, accepting the order for the surplus proceeds; the draft for ten thousand ($10,000) dollars was never accepted by the defendants, but was obtained from them shortly after by Patterson's clerk.

Wilmot took no action respecting the defendants' letter accepting Patterson's order, and the order itself remained in the defendants' possession.

Wilmot called at defendants' office again on the eighteenth, when the defendants urged him to receive Patterson's order, which he refused to do.

Shortly afterwards, Wilmot called upon the defendants again, with his counsel, when the latter examined the defendants' books, and saw the account between defendants and Patterson.

On the twentieth of May, the plaintiffs commenced an action against Patterson to recover the amount due them for the flour in question, and obtained a warrant of attachment. The suit was for this flour sold and delivered.

The affidavit on which the attachment issued, made by one of the plaintiffs, stated that this flour had been sold and delivered to Patterson.

About the first of September, the defendants, having received an account of sales from their Liverpool house, informed Wilmot that they had some money for him, at which the latter expressed his satisfaction.

Accordingly, on the fifth of September, the defendants paid the plaintiffs two thousand five hundred dollars ($2,500), and took their receipt on account.

On the thirteenth of September, the defendants having made up their accounts with Patterson, and ascertained that there was still a balance of three hundred and eleven dollars and twenty-seven cents ($311.27) due to him, paid over this balance also to the plaintiffs under Patterson's order.

On that occasion the defendants demanded of Wilmot a receipt in full of all demands, they having learned that he intended to hold them responsible for the balance of the purchase-money of the flour in question. Wilmot refused to give them such a receipt, but said he had no objection to giving them a receipt which would show that they had fully complied with Patterson's order;

whereupon he wrote such a receipt and the defendants received it.

This action was commenced on the ninth day of December, 1854.

The case came on for trial on the fifteenth day of February, 1858. At the close of the trial, the defendants' counsel moved for a nonsuit, upon the following grounds:

First. That the evidence did not substantiate any cause of action stated in the complaint, and was not sufficient to go to the jury for that purpose.

Second. That the receipt from Patterson of five thousand ($5,000) dollars, on the thirteenth of May, 1854, and the suing out of the attachment after Patterson's departure for Europe, and causing it to be served against the balance of the proceeds of the consignments, through Wallace, the London consignee, were acts which ratified the sale and delivery of the flour in question to Patterson, and deprived the plaintiffs of any right to recover in this action.

Third. That, with knowledge of the representations on which, and the circumstances under which the ships' receipts were alleged to have been obtained from the plaintiff, and with knowledge that Patterson had previously received from the defendants the advances applicable to the flour in question, the plaintiffs received the defendants' written acceptance of Patterson's order on them for the net proceeds of their sales, over and above their advances, and afterwards received and receipted for such net proceeds, which acts of the plaintiffs amounted to a ratification, by the plaintiffs, of their sale and delivery of the flour to Patterson, and of the transactions between Patterson and the defendants, and, consequently, precluded the plaintiffs from recovering in this action.

The court granted the motion, and the plaintiffs' counsel excepted.

The following is a copy of the order accepted by the defendants:

"Messrs. Thomas Richardson & Co. will please pay over to Messrs. John Wilmot & Co., or order, the proceeds of sales of 8,164 barrels of flour, shipped to Richardson, Spence & Co., Liverpool, after deducting advances made me, and your charges to the amount of ten thousand one hundred and fifteen $\frac{12}{100}$ dollars.

                          "WALTER PATTERSON."

"It is understood that no further advances have been made further than stated in account rendered by Thomas Richardson & Co., nor shall be hereafter made unless with the consent of John Wilmot & Co., by written order, said account being dated May 16, 1854, being an advance on above named flour, say 8,164 barrels.

                          "WALTER PATTERSON."

On the 17th of May, 1854, the defendants accepted that order, and then wrote to the plaintiffs a letter, stating their acceptance thereof, and that they had written their house in Liverpool a statement of the order and its acceptance.

The part under the first signature of the order was written by J. Wilmot himself, and the letter of acceptance was produced and proved by the plaintiffs on the trial.

The receipt signed and drawn by plaintiffs when the last money was paid by defendants to them is as follows:

                  "NEW YORK, *September* 13, 1854.

"Received from Thomas Richardson & Co. three hundred and eleven $\frac{27}{100}$ dollars, being balance in full of proceeds of sold flour, as per your acceptance of Walter Patterson's order in our favor.

(Signed,)              "JNO. WILMOT & CO."

Judgment affirmed at General Term and defendants appeal to this court.

*C. C. Langdell*, for plaintiffs.

*Aug. F. Smith*, for defendants.

PECKHAM, J. The flour in question was purchased by Patterson the fifth of May, on which day the bought and sold notes were delivered by the broker, McKean, to plaintiffs and to Patterson. On the ninth of May the defendants made advance to Patterson of seven dollars per barrel thereon, in the faith that it was his flour. It had been sold by plaintiff at $7.93¾ per barrel to Patterson. On the eleventh of May, the flour having been delivered on board the vessels for Liverpool, the plaintiffs delivered the ships' receipts therefor to McKean, as they were conditionally to be returned if he failed to get the money thereon from defendants. These were delivered by Patterson to the defendant on the twelfth, who then advanced to him six thousand six hundred fifty-one $\frac{10}{100}$ dollars, but on account of other flour. On the thirteenth or fourteenth, the vessels, containing the flour, sailed for Liverpool.

On Tuesday, the sixteenth of May, for the first time, Wilmot called on defendants as to this flour. On the thirteenth they had received of Patterson five thousand dollars upon it.

It is entirely clear from the conceded facts that the defendants acted in entire good faith in the whole transaction. There is not a fact at war with this view. The same may be said of the plaintiffs. It is a question of mere law as to the rights of the parties.

The plaintiffs insist here that they are entitled to recover the proceeds of the flour to the extent of their claim against Patterson for the balance of the purchase-money, as money had and received by the defendants to the plaintiffs' use. That the title to the flour vested in Patterson by the bought and sold notes before delivery of the ships' receipts and certainly by the delivery of the flour on the ships. That they still had a lien for the purchase-money which they never waived, and the flour having been sold by defendants, their action for money had and received lies against defendants. See *Terry* v. *Wheeler*, 25 N. Y., 520;

*Kimberly* v. *Patchin,* 19 N. Y., 330, and cases cited; Pars. Mer. Law, 42.

When the whole facts were known to the plaintiffs, that the ships had sailed with the flour and they were unpaid in about ten thousand dollars, it may be they had a right to affirm the sale and prosecute for the price, or they might have rescinded the sale and looked to the flour; notified the defendants that they claimed the flour, and wholly disaffirmed the sale.

There may have been considerable question whether they could, under the circumstances, disaffirm the sale. There is none whatever as to their authority and power to ratify it. They could not do both.

On the twentieth of May, three days after Wilmot's interview with the defendants and Patterson, the plaintiffs commenced a suit against Patterson for this demand for goods sold and delivered. They obtained an attachment upon an affidavit of the plaintiff Wilmot, in which he swears that Patterson is indebted to the plaintiffs in over ten thousand dollars for this flour, sold and delivered to him on the twelfth of May. There is not one word of qualification or explanation of that suit or of that affidavit.

Was not the sale and the delivery, then, fully ratified by that suit? I think it was. *Morris* v. *Rexford,* 18 N. Y., 552.

This, it will be observed, was directly after the whole matter was consummated. Whether the delivery was qualified or absolute; whether the sale was fraudulent or fair, the plaintiffs, by this affidavit and proceeding elected to hold it by an action, a consummated sale, an actual, absolute delivery.

The ships' receipts had been handed over by plaintiffs on the twelfth of May, and on the thirteenth, Patterson paid them on the flour, five thousand dollars ($5,000).

Again, the plaintiffs deny that they received the order in their favor upon the defendants, drawn by Patterson, and declare they refused to receive it.

If they did, the conduct of the plaintiffs entirely differed with their declarations. Wilmot himself drew the latter portion of this order upon the defendants. The letter of acceptance from the defendants was received and retained by the plaintiffs, the money was paid to Wilmot upon that order, and so expressly received by him and receipted.

How can the declaration of Wilmot, that he positively refused to receive or have anything to do with that order, made on or before the eighteenth of May, qualify his plain affirmative acts thereafter. He did, in fact, have something to do with the order. He received and retained the letter of acceptance thereof. He received, on two different occasions in September, the money due thereon, and he receipted that money as received thereon.

The declarations, if made as claimed, were entirely idle and immaterial, in view of his subsequent conduct. The plaintiffs did, in fact, receive the order and its payment to the whole amount of the funds applicable thereto.

By this order in the plaintiffs' favor, the proceeds, in part, of this same flour, were appropriated to the plaintiffs. *They thus, in substance, averred or sanctioned its sale* in Liverpool by the defendants and ratified the sale to Patterson. *Bank of Beloit* v. *Beal*, decided last term of this court, not reported; *Palmerton* v. *Huxford*, 4 Denio, 166; *Mosson* v. *Bover*, 1 id., 69.

There was in the evidence touching this ratification no disputed question of fact for the jury. Had the jury found against the ratification — against the plaintiffs' election to consider this a sale of the flour to Patterson, it would have been the clear duty of the court to set that verdict aside.

In such a case as a general rule the court may properly nonsuit the plaintiffs.

The theory of the plaintiffs' counsel that the plaintiffs had the right to sue for goods bargained and sold to Patterson, though not delivered, that they might waive the tort of the fraudulent purchase, and thus, without

ratifying the transaction to Patterson of a sale and delivery, is theory only, and not founded upon the facts of this case. The law of it need not be considered. They brought no suit for goods bargained and sold.

Several exceptions were taken in the course of the trial to the decisions of the court in rejecting evidence offered by the plaintiffs.

As a general rule conversations between third parties are inadmissible. Yet there are many exceptions to the rule; conversations are frequently part of the transaction. They are then acts. If the plaintiffs had desired to prove any conversation as an act, or in other words to prove an act by a conversation, he should have called the attention of the court to the exception to the general rule, to the act sought to be proved. Here the court stated that it would receive any evidence of acts, not of conversations.

The conversation admissible of third parties is an act.

There is, however, another answer to all the rejected evidence. Had it been admitted, it could not have changed the legal aspect of the case. It all occurred prior to the receipt of the letter of acceptance of the defendants by the plaintiffs, of the order in the plaintiffs' favor.

The judgment should be affirmed.

Judgment affirmed.